**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Norman Johnson (R-10495), | ) | |
| | ) | |
| Petitioner, | ) | No. 17-cv-03997 |
| | ) | |
| v. | ) | Judge John F. Kness |
| | ) | |
| David Gomez, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER**

By separate order, the Court sets a status hearing to address a single issue: whether the parties, through discovery or otherwise, have developed record evidence concerning the decision made by Petitioner's trial counsel not to call third party Andrew Sanford as a trial witness. See accompanying Statement for details.

**STATEMENT**

Before the Court is Petitioner Norman Johnson's petition under 28 U.S.C. § 2254 challenging his 2011 Cook County conviction for the shooting death of Jarrell Jackson. Petitioner asserts one claim: that his trial attorneys were ineffective for failing to call eyewitness Andrew Sanford to testify at trial. Petitioner acknowledges this claim is procedurally defaulted because the state courts dismissed it on an independent and adequate state procedural ground—namely, Petitioner's failure to include an affidavit from Sanford stating that Sanford would have testified and outlining what he would have said. Petitioner contends, however, that he satisfies the fundamental miscarriage of justice exception to procedural default: *i.e.*, that new evidence demonstrates he is actually innocent such that this Court may review his ineffective-assistance claim on the merits.

As explained below, determining whether Petitioner satisfies the federal gateway actual-innocence exception to procedural default would necessitate factual findings by this Court that might materially affect a later actual-innocence claim in state court. Addressing the ineffective-assistance claim on the merits, however, appears less complicated. But before considering the merits, the Court will ask the parties to address and, as necessary, supplement the record with evidence concerning the circumstances of why Petitioner's trial counsel did not call Sanford to testify at trial.

## I.    Background

At trial, no physical evidence connected Petitioner to the shooting.[1] Instead, the evidence against Petitioner consisted of (1) testimony from three eyewitnesses— Jason Coley (co-conspirator), Margaret Faulkner (bystander), and Doug Johnson ("Fresh") (intended target); (2) testimony from officers and investigators describing these witnesses' identification of Petitioner as one of the shooters; and (3) Coley's videotaped confession stating that he was the main shooter and that Petitioner was with him. *See gen. People v. Johnson*, 994 N.E.2d 962, 964-68 (Ill. App. Ct. 2013) (direct appeal); *People v. Johnson*, 2016 IL App (1st) 142544-U at ¶¶ 3-23 (Ill. App. Ct. 2016) (postconviction appeal).

According to Coley's testimony, on the night of September 21, 2008, Coley, Petitioner, and another man went to the 700 block of South St. Louis Street in Chicago. The troika was looking for Fresh, who a week or so earlier had stolen one of Coley's guns. Dkt. 36 at 494-98. Fresh was on a bicycle next to a group of men playing dice on the sidewalk. Coley, with the two men behind him in a triangle formation, walked out of an alley into the middle of the street. Coley thought he saw Fresh reach toward his waist as if reaching for a gun. Coley then began shooting. *Id.* at 497-506. Coley was arrested several months later and confessed. In his videotaped confession, which was played at Petitioner's trial (but was not transcribed), as well as his trial testimony, Coley stated that Petitioner was with him during the shooting. *Id.* at 502-09, 548.

During the shooting, Fresh was struck in the arm but survived. Jerrell Jackson, who was playing dice next to Fresh, was killed. Andrew Sanford, who was in a first-floor apartment just above the dice game, was struck in the arm and sustained a minor injury. *Id.* at 371, 452-53. Fresh testified at Petitioner's trial and identified Coley as the lead shooter. Although Fresh testified that he could not identify either man with Coley, Fresh's grand jury testimony, which was read at trial, positively identified Petitioner as a shooter. *Id.* at 466-69, 477-78. In addition, a police detective testified that Fresh previously identified Petitioner in photo arrays and stated that Petitioner was with Coley during the shooting. *Id.* at 790-92.

Margaret Faulkner, who was staying at her cousin's first-floor apartment across the street from the dice game, saw the shooting from a window adjacent to the alley and overlooking St. Louis Ave. Faulkner testified she saw two (not three) men walk out the alley onto the street and begin shooting at Fresh and the other

---

[1] As the prosecutor said in his opening statement, "They didn't leave guns. They didn't leave DNA. They didn't leave fingerprints. There's none of that physical evidence." Dkt. 36 at 344. During closing argument, the prosecutor repeated that "there is no physical evidence tying [Petitioner] to the crime scene." *Id.* at 716. The only physical evidence recovered from the scene were twelve shell casings, eleven of which came from the same gun. *Id.* at 344, 634.

individuals playing dice. *Id.* at 388-90, 428 (Faulkner admitted at trial that, from her vantage point, there could have been a third man in the alley). Months later, Faulkner identified Petitioner in a lineup and described him as short and dark to both an officer and a defense investigator. *Id.* at 388-91, 398-99, 422-23. Faulkner acknowledged on cross-examination, however, that officers showed her a picture of Petitioner before the lineup and told her that Petitioner was always with Coley. *Id.* at 423-24.

Petitioner's defense at trial was that he was with his then-girlfriend English Wilson at the time of the shooting. During the afternoon before the shooting, Wilson had returned to her apartment from a recent hospital stay. *Id.* at 874-76. According to Wilson, Petitioner helped her up the stairs of her apartment building and stayed with her all afternoon and evening. *Id.* at 878-80. But several details in Wilson's testimony—namely, who carried her upstairs and whether she and Petitioner stayed in her bedroom the entire evening—were at odds with details provided by her cousin Deontae Sanders, who testified that he was staying at Wilson's apartment at the time. *Id.* at 909-11.

During her opening statement at trial, Petitioner's counsel, believing that the prosecutor had mentioned Andrew Sanford during his opening statement, told jurors that Sanford arguably "was in the best position to see who these shooters were" because Sanford "was looking out his window." *Id.* at 346. But according to Petitioner's counsel, when Sanford viewed a lineup, he could not identify Petitioner as a shooter. *Id.* During closing argument, after neither party called Sanford to testify, Petitioner's attorney again mentioned Sanford: "[W]e know that there is a third victim [Sanford], a solid citizen, a person who was shot in his home." *Id.* at 706. Petitioner's counsel emphasized that "[w]e know his residence is on the west side [of] the street . . . [with a] perfect shot for looking out the window and seeing who did this . . . [A]nd yet the State did not call him." *Id.*

In an affidavit filed with his state postconviction petition, Petitioner alleged that his trial counsel showed him statements from Sanford (presumably in either a police report or a report from a defense investigator). *Id.* at 52. Petitioner asked his attorney why she was not calling Sanford as a trial witness, and she responded, "[F]or two years . . . she gave it some thought and decided that she wanted the State to do it." *Id.*

## II.    Procedural Default

As this Court previously stated, Petitioner acknowledges that, because the state post-conviction courts denied his ineffective assistance of counsel claim for failing to include an affidavit from Sanford stating he would have testified and what he would have said at trial, the claim is procedurally defaulted. *See* Dkt. 16; *Johnson*, 2016 IL App (1st) 142544-U, ¶¶ 40-41 (relying on 725 ILCS 5/122-2) (a state postconviction claim that a witness should have been called to testify must include either an

affidavit from the witness or other corroborating evidence describing what his testimony would have been). As the Seventh Circuit has explained, the Illinois affidavit rule is an independent and adequate state procedural ground defaulting a claim from federal habeas review. *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016).

Because of the procedural default, federal habeas review of the claim's merits cannot occur unless Petitioner demonstrates either "(1) cause for the default and actual prejudice or (2) that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Thomas v. Williams*, 822 F.3d 378, 386 (7th Cir. 2016) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). As explained in the Court's April 27, 2020, order, Petitioner's attempt to satisfy the cause requirement is without merit. Dkt. 25 (citing *Crutchfield v. Dennison*, 910 F.3d 968, 978 (7th Cir. 2018) (because Illinois prisoners can raise ineffective assistance of trial counsel claims on direct appeal, *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 569 U.S. 413 (2013) do not permit ineffective assistance of post-conviction counsel claims to serve as cause for a procedural default).

## A. The "Actual Innocence" Standard in Federal and State Courts

Without the cause and prejudice exception to procedural default, a review on the merits of Petitioner's § 2254 claim can occur only if he satisfies the fundamental miscarriage of justice exception, which requires "a convincing showing of actual innocence." *Jones*, 842 F.3d at 461. To pass through "the actual-innocence gateway to a merits review of a procedurally barred claim, the petitioner must have 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial, . . . and must persuade the district court that it is 'more likely than not that no reasonable juror would have convicted him in light of the new evidence.' " *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). New evidence "does not mean 'newly discovered evidence'; it just means evidence that was not presented at trial." *Jones*, 842 F.3d at 461 (quoting *Schlup*, 513 U.S. at 322).

Actual innocence, standing alone, cannot lawfully form the basis of federal habeas relief. As the Supreme Court has explained, "We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (citing *Herrera v. Collins*, 506 U.S. 390, 404-05 (1993)); *see also House v. Bell*, 547 U.S. 518, 554-55 (2006). Instead, actual innocence in a federal habeas proceeding is simply a means to obtain a merits review of a procedurally defaulted claim. *Schlup*, 513 U.S. at 316 (the rationale of the actual-innocence exception is that a petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error"). Even if Petitioner's new evidence demonstrates actual innocence sufficient to

4

overcome the procedural default, it only permits a federal court to *review* the merits of his ineffective assistance claim.

In Illinois, however, actual innocence can be the foundation of a freestanding claim for postconviction relief. *See People v. Shaw*, 143 N.E.3d 228, 240 (Ill. App. Ct. 2019). As the Supreme Court of Illinois has explained, the "wrongful imprisonment of an innocent person violates procedural and substantive due process under the Illinois Constitution and, thus, a freestanding claim of actual innocence is cognizable under the [Illinois Post-Conviction] Act." *Id.* (citing *People v. Washington*, 665 N.E.2d 1330, 1336 (Ill. 1996)).

Although the substantive actual-innocence standard under Illinois law contains some additional elements—namely, that the evidence be not only new, but also noncumulative and material—the ultimate determination under the state and federal actual-innocence standards appears to be the same. Both standards require a court to determine if a jury hearing all the evidence, new and old, probably would not have convicted. For the Illinois substantive actual-innocence claim, the state postconviction court "typically will review the evidence presented at the evidentiary hearing to determine first whether it was new, material, and noncumulative," and then "consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *People v. Coleman*, 996 N.E.2d 617, 637-38 (Ill. 2013). Probability, not certainty, is "the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.* at 638 (citing *People v. Davis*, 966 N.E.2d 570, 583 (Ill. App. Ct. 2012)).

The federal actual-innocence gateway standard similarly requires a court to "consider[] all the evidence, old and new, incriminating and exculpatory" and "make a probabilistic determination" as to "how reasonable jurors would react to the overall, newly supplemented record." *Jones*, 842 F.3d at 461 (citing *House*, 547 U.S. at 538, and *Schlup*, 513 U.S. at 329). A successful federal gateway showing of actual innocence is one where "a court cannot have confidence in the outcome of the trial." *Schlup*, 513 U.S. at 316. Under both standards, "[p]robability, not certainty, is the key." *Coleman*, 996 N.E.2d at 638. But in federal court, such a showing allows only for a habeas court to proceed to a review of the merits of a procedurally-defaulted constitutional claim; in Illinois, by contrast, that same showing results in a new trial.

   B.   *Possible Collateral Estoppel Effect of Resolving the Actual Innocence Claim*

In support of his federal actual-innocence argument, Petitioner submits three pieces of new evidence: (1) Andrew Sanford's affidavit (obtained after Petitioner filed his § 2254 petition) stating that he witnessed the shooting and, although he saw none of the shooters' faces because they wore hoodies and it was dark, Petitioner could not

have been a shooter because he was substantially shorter than the actual shooters (Dkt. 9-1); (2) Jason Coley's affidavit stating that he was a shooter, that Petitioner was not with him, and that Coley lied at trial and in his videotaped confession to protect the men who were with him, (Dkt. 16-1); and (3) undated text messages from Margaret Faulkner stating that she did not see the shooters' faces and was pressured by officers to identify Petitioner as a shooter. (Dkt. 46-1.) This evidence was not presented to the Illinois courts.

In the Court's view, proceeding to an assessment of Petitioner's asserted new evidence at this point could have a profound effect on his freestanding actual-innocence claim. As the Illinois courts have explained, the "collateral estoppel doctrine bars relitigation of an issue already decided in a prior case." *People v. Tenner*, 794 N.E.2d 238, 247-48 (Ill. 2002), as modified on denial of reh'g (Mar. 31, 2003). "The doctrine applies 'when a party . . . participates in . . . different causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction.'" *Id.* (emphasis omitted) (quoting *People v. Moore*, 561 N.E.2d 648, 650 (Ill. 1990); *see also Lieberman v. Liberty Healthcare Corp.*, 948 N.E.2d 1100, 1105 (Ill. App. Ct. 2011).[2]

Even if Illinois' collateral estoppel doctrine did not apply to bar relitigation of the entire actual-innocence issue, it could apply to certain factual findings, such as the credibility of Coley's recantation. *See Tenner*, 794 N.E.2d at 248 (where the issue of a defendant's fitness for trial was determined by a prior court when addressing an ineffective assistance of counsel claim, the fitness issue could not be relitigated in a later proceeding). Given this potentially-preclusive effect, the Court, if possible, believes it best to avoid factual findings that may affect a potential freestanding actual-innocence claim in Illinois.

### C.    *Addressing the Merits of Petitioner's Habeas Claim*

In the ordinary case, federal courts should determine whether a petitioner has met an exception to procedural default before addressing the merits of his constitutional claim. But that approach is not mandatory if the claim's merits are more "easily resolvable." *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). As the Seventh Circuit explained in the context of civil commitment proceedings, "We need not resolve . . .

---

[2] In Illinois, the "collateral estoppel doctrine has three requirements: (1) the court rendered a final judgment in the prior case; (2) the party against whom estoppel is asserted was a party or in privity with a party in the prior case; and (3) the issue decided in the prior case is identical with the one presented in the instant case." *Tenner*, 794 N.E.2d at247. Of particular relevance here, Illinois courts have applied the collateral estoppel doctrine several times to an issue previously decided by a federal district court addressing a federal habeas corpus petition. *Id.*; *People v. Austin*, 2019 IL App (1st) 160451-U, ¶ 48 (Ill. App. Ct. 2019) (unpublished); *People v. White*, 556 N.E.2d 535, 538 (1st Dist. 1989).

whether the actual innocence exception to the general rule of procedural default applies" where "a merits decision" is much clearer. *Brown v. Watters*, 599 F.3d 602, 609 (7th Cir. 2010); *see also Washington v. Boughton*, 884 F.3d 692, 698 (7th Cir. 2018) (bypassing procedural issues and denying a claim on the merits is "consistent with the interests of comity, finality, federalism, and judicial efficiency that are at the heart of both the exhaustion requirement and the procedural default doctrine") (cleaned up); *Estremera v. United States*, 724 F.3d 773, 775 (7th Cir. 2013) ("It makes sense to tackle the merits first when they are easy . . . while other procedural defenses, such as waiver, default, or lack of exhaustion, remain in the background") (citing 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies avail-able in the courts of the State"); *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003) (because "the question of procedural default present[ed] a complicated question of Michigan law," the Sixth Circuit "proceed[ed] directly to the merits"); *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (addressing ineffective assistance of counsel claim first without determining whether petitioner made the requisite showing of actual innocence to excuse a procedural default).

This case appears to be one in which it might "make[] sense" to address the merits first instead of tackling the issue of procedural default. *See Estremara*, 724 F.3d at 775. Petitioner's ineffective assistance of counsel argument appears less complicated than the actual-innocence issue, which would require the Court to determine the credibility of and weigh the significance of all the new evidence—especially Coley's recantation and Faulkner's texts. Conversely, the ineffective assistance of counsel claim is potentially more straightforward; and, unlike the matter of actual innocence as a factor affecting the procedural default analysis, it is at the heart of the merits of this habeas case.

To establish ineffective assistance of counsel, Petitioner must demonstrate (1) that his attorneys' performance "fell below an objective standard of reasonableness," and (2) this deficient performance resulted in prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Failing to prove either element "defeats a petitioner's claim." *Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020) (cleaned up).

As it stands currently, the record might be sufficient to permit the Court to address the prejudice prong. Petitioner has submitted an affidavit from Sanford stating what he would have said had he been called to testify, and the Court has the trial transcript to determine whether it was "substantially likely that [Petitioner] could have raised at least a reasonable doubt" had the jury heard Sanford's testimony. *Blackmon v. Williams*, 823 F.3d 1088, 1107 (7th Cir. 2016) (quoting *Thomas v. Clements*, 789 F.3d 760, 772 (7th Cir. 2015)).

But the record contains little with which to assess *Strickland*'s deficient performance prong. In her opening statement, Petitioner's counsel's remarks reflected both that she believed the prosecutor mentioned Sanford in his opening statement (he did not) and her resulting assumption that the State was going to call Sanford as a trial witness for the prosecution. (Dkt. 36, pg. 346.) During her closing argument, however, Petitioner's counsel addressed the effect of Sanford—even though he did not testify—a circumstance that suggests counsel may have believed it better to talk about Sanford's absence than call him as witness. As counsel argued, "We know his residence is on the west side of the street . . . on the first floor . . . [with a] perfect shot for looking out the window and seeing who did this . . . and yet the State did not call him." *Id.* at 706. Counsel went on, "Now, [the prosecutor] may say, well, [defense counsel], you call him. What is this? But we don't have any burden of proof. We don't have to bring you eyewitnesses to persuade you that [Petitioner] didn't do this." *Id.* at 706-07. These comments suggest, perhaps, that counsel was aware of the likely content of Sanford's testimony yet chose intentionally not to call Sanford precisely to set up the argument that there was unaired evidence damaging to the prosecution's case. This possible inference is bolstered by counsel's alleged comment to Petitioner that "for two years . . . she gave [calling Sanford as a witness] some thought and decided that she wanted the State to do it." *Id.* at 52.

Under the *Strickland* standard, the only strategic choices that are "virtually unchallengeable" are those "made after thorough investigation of" the relevant facts. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690-91). Defense counsel have "a duty to make reasonable investigations or to make a reasonable decision that make particular investigations unnecessary." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 691). As it stands now, the record before the Court contains no information concerning, for example, what, if any, pretrial investigation defense counsel made before deciding she wanted the prosecution, not the defense, to call Sanford. Nor does the record address whether defense counsel hinged Petitioner's defense on the State calling Sanford such that, when that "strategy blew up, counsel had no Plan B"—which is another potential basis for a finding of constitutionally-deficient performance. *Dunn*, 981 F.3d at 593.

Taken together, these considerations suggest that, even if the Court were to determine that Petitioner satisfied the federal gateway actual-innocence standard, the record would be insufficient to determine whether Petitioner has met the demanding *Strickland* standard. Before the Court determines whether it needs to delve into the gateway actual-innocence issue, therefore, the Court will ask the parties to elaborate on the investigation by defense counsel (if any) into Sanford as a potential trial witness, as well as the strategic choices (if any) that underlay the decision not call Sanford at trial. These questions—and the contours of how to address them—will be considered at a hearing to be set by separate order.

SO ORDERED in No. 17-cv-03997.

Date: May 20, 2021

_____

JOHN F. KNESS
United States District Judge