## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NORMAN JOHNSON (R-10495),    )
    )
    Petitioner,    )    No. 17-cv-03997
    )
v.    )    Judge John F. Kness
    )
CHARLES TRUITT, Warden,[1]    )
    )
    Respondent.    )

## MEMORANDUM OPINION AND ORDER

Petitioner Norman Johnson filed this 28 U.S.C. § 2254 habeas corpus action to challenge his 2011 Illinois conviction for shooting to death a spectator at a sidewalk dice game. Petitioner contends that his trial counsel was ineffective for failing to call Andrew Sanford, a witness to the shooting. Petitioner also seeks leave to conduct discovery into the reasons why his counsel chose not to call Sanford.

As explained below, Petitioner cannot demonstrate a reasonable probability that the trial would have ended with an acquittal had Sanford testified. Moreover, because counsel made a reasonable strategic decision not to call Sanford as a witness, Petitioner cannot show that his counsel was ineffective. For these reasons, and because allowing discovery would be inconsistent with the rules that apply in habeas cases, the Court denies both Petitioner's Section 2254 petition and his request for discovery.

---

[1] By operation of Rule 25(d) of the Federal Rules of Civil Procedure, Charles Truitt, the current Warden of Stateville Correctional Center, is substituted as Respondent in place of David Gomez.

## I.     BACKGROUND

### A.     Criminal Conduct and Evidence at Trial

As found by the courts of Illinois, Petitioner participated in the September 2008 murder of Jarell Jackson, who had the misfortune of standing on the sidewalk next to Petitioner's intended target during a neighborhood dice game. *People v. Johnson*, 994 N.E.2d 962, 964–68 (Ill. App. Ct. 2013). After a jury found Petitioner guilty of murder, an Illinois judge sentenced him to forty years of imprisonment. No physical evidence connected Petitioner to the shooting.[2] Instead, the evidence consisted of: (1) testimony from three eyewitnesses, namely, Jason Coley (a co-conspirator), Doug Johnson (the intended target, known as "Fresh"), and Margaret Faulkner; (2) testimony from officers and investigators about these witnesses' identification of Petitioner during the criminal investigation; and (3) Coley's videotaped confession stating that he was the main shooter and that Petitioner was with him. *See id.* at 964–68. Because the details of the evidence at trial are important to the resolution of the present habeas case, this opinion examines the events at trial in some detail.

### 1.     Coley's Testimony

Coley testified that, on the night of September 21, 2008, he, Petitioner, and another man who Coley did not know went to the 700 block of South St. Louis Avenue

---

[2] In opening statements, the prosecutor said: "They didn't leave guns. They didn't leave DNA. They didn't leave fingerprints. There's none of that physical evidence." (Dkt. 36 at 344.) During closing argument, the prosecutor repeated that "there is no physical evidence tying [Petitioner] to the crime scene." (*Id.* at 716.) The only physical evidence recovered from the scene were 12 shell casings, 11 of which came from the same firearm. (*Id.* at 344, 634.)

in Chicago. The men were looking for Fresh, who a week or so earlier had stolen a firearm that belonged to Coley. (Dkt. 36 at 492–95.) Coley, with the two men behind him, exited an alley on the east side of St. Louis, saw Fresh across the street standing next to a group of people playing dice, and began shooting. (*Id.* at 496–99.) Coley testified that, before he started shooting, he thought he saw Fresh reach toward his waistband, as if reaching for a gun. (*Id.* at 497.)

Fresh was hit in the arm but survived. (*Id.* at 452–53.) Jerrell Jackson, who was playing dice next to Fresh, was shot and killed. Andrew Sanford, who was in a first-floor apartment just above the dice game, was struck in the arm by a bullet and sustained a minor injury. (*Id.* at 371.)

Several months following the shooting, Coley was arrested and confessed in a videotaped interview, played for the jury at trial. (*Id.* at 502–03, 548.) Neither Coley's videotaped confession, nor its transcript, is part of the record before this Court. (*See id.* at 547–48.) Testimony about the confession, however, indicates Coley stated during the taped interview that Petitioner was with him during the shooting. (*Id.* at 504–05, 507.)

Defense attorneys attempted to establish that the only reason why Coley said Petitioner was with him was because he knew Petitioner had been arrested and released several weeks earlier, and he believed Petitioner told officers that Coley was responsible for the shooting. (*Id.* at 536–37.) Coley did not know that Petitioner had been arrested merely on a cannabis charge. (*Id.* at 536.) On redirect examination, however, Coley stated he began to confess, and to implicate Petitioner in the

confession, when officers informed Coley that the individuals he said he was with at the time of the shooting did not support his alibi. (*Id.* at 545–46.)

### 2. *Fresh's Testimony*

Fresh testified that, just before the shooting, he was on a bicycle next to a group of men playing dice. (*Id.* at 446–47.) Fresh saw "three guys at the tip of the alley" across the street "like in a triangle." (*Id.* at 447, 451.) One of the men was wearing a white t-shirt with a baseball cap pulled down low; the other two were wearing hoodies with the hoods up. (*Id.* at 447–48.) The man with the white t-shirt yelled "Yeah N------" and started shooting. (*Id.* at 448.) Fresh recognized Coley "because [he] heard [Coley's] voice." (*Id.* at 449.) Fresh testified that "once they started shooting, . . . [he] closed [his] eyes, . . . jumped off the bike," and ran. (*Id.* at 452.) Fresh was struck in the arm by a bullet. (*Id.* at 453.)

Fresh made clear at trial that he did not want to testify and was doing so under duress. (*Id.* at 479, 488.) According to his trial testimony, he saw none of the shooters' faces and recognized Coley only from his voice. (*Id.* at 447–49.) The prosecutor then read aloud Fresh's grand jury testimony, which stated that he saw both Petitioner and Coley shoot. (*Id.* at 467–69.) Jurors also heard Assistant State's Attorney Jodie Peterson testify about the grand jury proceedings and her conversation with Fresh that day, during which he "indicated to [her] that he saw [Petitioner] fire the weapon. And there was no hesitancy to [her] when he made those comments." (*Id.* at 588.) Jurors further heard testimony from Police Detective Roberto Garcia who stated that

4

Fresh was shown at least five photo arrays, and the only photographs he identified were of Coley and Petitioner. (*Id.* at 790–93.)

### 3. *Faulkner's Testimony*

Faulkner, who was staying at her cousin's apartment across the street from the dice game, testified she saw the shooting from a window that was adjacent to the alley from where the shooters emerged. (*Id.* at 384–85.) Initially, she testified that she saw only two men walk out of the alley. (*Id.* at 388–90.) Faulkner later explained, however, that she may not have been able to see a third man from her vantage point in the window. (*Id.* at 428.)

Faulkner testified that she identified both Coley and Petitioner as the shooters in separate lineups. (*Id.* at 397–99, 400–01.) Faulkner also testified, however, that she later told Defense Investigator Kimyona Taylor that two officers visited Faulkner before Petitioner's lineup, that the officers showed her a picture of Petitioner, and that the officers told her: "this is who's identified with Jason [Coley] all the time, so it has to be him." (*Id.* at 424; *see also* Dkt. 36 at 434–35.) Faulkner felt the officers "were trying to make [her] say it was him and [she] said it probably is him." (*Id.*) After identifying Petitioner in a lineup, police officers told her she "did good in picking Norman Johnson as the second person." (*Id.* at 425.)

Officer Gregory Jacobson testified that he interviewed Faulkner on the night of the shooting. (*Id.* at 649–50.) According to Jacobson, Faulkner "never told [him] that she knew those two people from the neighborhood." (*Id.* at 653.) But Faulkner testified, "I did tell him that." (*Id.* at 426.) Faulkner also described both shooters to

Defense Investigator Taylor: "one shooter, ID, light skinned . . . Jason [Coley], big eyes, average height . . . other shooter saw before with Jason but doesn't know his name, short and dark." (*Id.* at 856–57, 422–23.)

### 4. *Defense Investigator Kimyona Taylor*

Petitioner's counsel called investigator Kimyona Taylor to testify. (*Id.* at 847.) In addition to Taylor testifying about her notes from her interview with Faulkner, during which Faulkner stated officers suggested to her that Petitioner was probably with Coley (*id.* at 848–52, 859), Taylor testified about the defense team's interview of Coley several weeks before trial. (*Id.* at 859–60.) Taylor stated that Coley informed the defense team that, contrary to what he told officers, he knew all the men with him on the night of the shooting. (*Id.* at 863–64.) When the prosecutor asked Taylor if Coley gave the names of any of the men with him, Taylor responded: "He called out Norman Johnson." (*Id.* at 865.)

### 5. *Petitioner's Alibi*

Petitioner's defense at trial was that, at the time of the shooting, he was with his then-girlfriend English Wilson. During the afternoon before the shooting, Wilson had returned to her apartment from a hospital where she had undergone a medical procedure. (*Id.* at 876–77.) According to Wilson, Petitioner helped carry her up the stairs to her apartment and stayed with her all afternoon and evening. (*Id.* at 878–79, 884–85.)

Wilson's cousin Deontae Sanders, then staying at Wilson's apartment, also testified. (*Id.* at 900–01.) Although Sanders stated that Petitioner was with Wilson

in her apartment at the time of the shooting, several details in Sanders's testimony—who carried Wilson upstairs, and whether she and Petitioner stayed in her bedroom the entire evening or watched television in the living room part of the time—contradicted Wilson's testimony. (*Id.* at 909–11, 883–85.)

### 6. *The Discussion About Sanford at Trial*

One of Petitioner's two defense attorneys informed jurors during her opening statement that the Government intended on calling Sanford to testify; that he had the best view of the shooting; that he knew Petitioner from the neighborhood; but that he could not identify Petitioner as one of the shooters. (*Id.* at 346.) Petitioner's other counsel noted, during closing argument, that the prosecutor did not call Sanford to testify even though he was struck by a bullet and had a view of the shooting from his window. (*Id.* at 706–07.)

Following trial, the jury convicted Petitioner of murder. (*Id.* at 749.) Although the trial court imposed a sentence of 24 years of imprisonment on Jason Coley, the court sentenced Petitioner to 40 years of imprisonment. (*Id.* at 762, 766.)

### B. Petitioner's Section 2254 Claim and Procedural Default

Petitioner argued in his state postconviction petition that his trial attorneys were ineffective for failing to call Sanford to testify at trial. (Dkt. 36 at 39–42.) But the state trial court denied the claim because the petition neither included an affidavit from Sanford summarizing his missing testimony nor provided sufficient justification for why Petitioner could not obtain such evidence. (*Id.* at 71–72.) Agreeing with the trial court, the state appellate court affirmed the denial of the

petition. *Johnson*, 2016 IL App (1st) 142544-U, ¶¶ 34–42 (citing the requirements of 722 ILCS 5/122-2 for an Illinois postconviction petition).

Petitioner acknowledges that, because the state courts denied his ineffective assistance claim on an independent and adequate state procedural ground, the claim is procedurally defaulted from federal habeas review. (Dkt. 9; Dkt. 16); *see also Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016) (an Illinois court's denial of a claim about an uncalled witness based on the absence of an affidavit or other evidence under Section 5/122-2 results in a procedural default). Petitioner contends, however, that he can satisfy the fundamental miscarriage of justice exception to procedural default because new evidence demonstrates that he is actually innocent such that this Court may review his ineffective assistance claim on the merits. (Dkt. 9; Dkt. 16); *see also House v. Bell*, 547 U.S. 518, 537 (2006) (addressing the actual-innocence exception to procedural default) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner supports his actual-innocence contention with three proffered pieces of new evidence: (1) Sanford's affidavit (obtained after Petitioner filed his Section 2254 petition); (2) an affidavit from Jason Coley recanting his trial testimony and confession statements that Petitioner was with him during the shooting; and (3) text messages from Margaret Faulkner suggesting that police officers may have pressured her lineup identification of Petitioner. (Dkt. 9-1; Dkt. 16-1; Dkt. 46-1.) Petitioner never presented any of this evidence to the state courts.

Although federal courts ordinarily determine if a petitioner has met an exception to procedural default before addressing the merits of any constitutional

claim, the Court's May 20, 2021 order noted that this sequence is not mandatory if the claim's merits are more "easily resolvable." (Dkt. 47 at 4–5 (quoting *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)))[3]; *see* 28 U.S.C. § 2254(b)(2); *see also Brown v. Watters*, 599 F.3d 602, 609–10 (7th Cir. 2010); *Washington v. Boughton*, 884 F.3d 692, 698 (7th Cir. 2018) (bypassing procedural issues and denying a claim on the merits is "consistent with the interests of comity, finality, federalism, and judicial efficiency") (cleaned up); *Estremera v. United States*, 724 F.3d 773, 775 (7th Cir. 2013) ("It makes sense to tackle the merits first when they are easy"). That practice is reflected in other Circuits as well. *See*, *e.g.*, *Miller v. Mullin*, 354 F.3d 1288, 1297 (10th Cir. 2004); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003); *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002).

Petitioner's ineffective assistance of counsel claim is more easily resolvable than his argument to excuse an obvious procedural default. Resolving whether

---

[3] This Court's May 20, 2021 order also observed that the federal actual-innocence gateway standard is similar to Illinois' freestanding actual innocence claim. *Compare Schlup*, 513 U.S. at 327 (defining the gateway actual-innocence standard as being "more likely than not that no reasonable juror would have convicted him in the light of the new evidence") *with People v. Coleman*, 996 N.E.2d 617, 637 (Ill. 2013) (explaining that "to succeed on a[n Illinois] claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial . . . conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result."). For both standards, "[p]robability, not certainty, is the key as . . . [a] court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Coleman*, 996 N.E.2d at 638; *see House*, 547 U.S. at 538 (a federal habeas "court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do' " when considering " 'all the evidence,' old and new, incriminating and exculpatory"). Because actual innocence is not a freestanding federal claim, *see McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013), this Court's finding of actual innocence would simply result in a merits review of Petitioner's ineffective-assistance claim. The state courts could then choose to defer to that finding and recognize a freestanding claim of actual innocence in a separate proceeding.

Petitioner can establish actual innocence would require multiple evidentiary determinations. Petitioner's ineffective assistance claim, however, is a straightforward Section 2254 claim about an uncalled witness that, as discussed below, can be decided on the current record. For these reasons, as well as those discussed in the Court's May 20, 2021 order, the Court will address the ineffective assistance claim without resolving the procedural default issue. *Estremera*, 724 F.3d at 775.

Before getting to the merits of Petitioner's ineffective assistance claim, the Court acknowledges that, at the time of its May 20, 2021 order, it believed that fuller information about the defense attorneys' reasons for not calling Sanford might simply be obtained by asking the attorneys. But the Court's order asking "the parties to elaborate" on this issue (Dkt. 47 at 8) has led Petitioner to file a motion to conduct discovery in the form of depositions of his former attorneys, their investigator, and possibly others, and to seek production of the attorneys' case file (Dkt. 50). In retrospect, the Court's order invited Petitioner to seek relief that is not permissible under the amendments to Section 2254 wrought by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). That issue is addressed more fully below.

## II. DISCUSSION

To establish a Sixth Amendment violation based on ineffective assistance of counsel, Petitioner must prove (1) deficient performance by his attorneys, and (2) prejudice resulting from that deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 687–97 (1984). A petitioner is entitled to habeas relief

"only if he satisfies both of *Strickland*'s prongs." *Westray v. Brookhart*, 36 F.4th 737, 749 (7th Cir. 2022) (quoting *Karr v. Sevier*, 29 F.4th 873, 880 (7th Cir. 2022)). The Court need not "address both components of the inquiry if the [petitioner] makes an insufficient showing on one." *Id.* (quoting *Strickland*, 466 U.S. at 697).

Petitioner cannot show prejudice based on the state-court record before the Court, so Petitioner's request for relief is denied. And although not necessary to the decision, the Court also notes that Petitioner cannot establish that his trial counsel's performance was deficient.[4] Finally, the Court denies Petitioner's discovery motion under Section 2254(e)(2).

## A.     Petitioner Cannot Establish Prejudice under *Strickland*

To prove prejudice, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Blackmon v. Williams*, 823 F.3d 1088, 1105 (7th Cir. 2016). Petitioner "does not have to prove that 'counsel's deficient conduct more likely than not altered the outcome in the case.' " *Thompson v. Vanihel*, 998 F.3d 762, 767 (7th Cir. 2021) (quoting *Strickland*, 466 U.S. at 694). But Petitioner "must demonstrate that the 'likelihood of a different result is substantial, not just conceivable.' " *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)). "[T]he

---

[4] As previously explained, this Court makes this determination without deciding whether Petitioner has established actual innocence to excuse his procedural default of his ineffective assistance claim. This Court makes no findings of fact with respect to Coley's recantation affidavit, Faulkner's text messages, or Defense Investigator Taylor's affidavit. If Petitioner files a state-law claim of actual innocence in state court, this opinion should have no effect on the state courts' consideration of that claim.

issue is not whether [Petitioner] is innocent, but whether if he had had a competent lawyer he would have had a reasonable chance . . . of being acquitted." *Stanley v. Bartley*, 465 F.3d 810, 814 (7th Cir. 2006); *see also Strickland*, 466 U.S. at 695 ("[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.").

In determining whether counsel's errors were prejudicial, the Court must consider the evidence that would have been presented at trial "but for counsel's unprofessional error" in the light of "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 694–95. The Court must then determine how the unpresented evidence "alter[s] the . . . evidentiary picture." *Id.* at 696. A verdict that is "only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* As a result, the Court must determine whether Petitioner would have had a reasonable chance of acquittal had Sanford's testimony been presented with the rest of the evidence adduced at trial.[5]

For this analysis, the Court will assume that Sanford would have testified to everything he states in his affidavit:

---

[5] When addressing the prejudice prong of an ineffective assistance of counsel claim, a habeas court must "evaluate the totality of the evidence—'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s].*'" *Wiggins*, 539 U.S. at 536 (quoting *Terry Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)); *see also Andrus v. Texas*, 140 S. Ct. 1875, 1886 (2020); *Woolley v. Rednour*, 702 F.3d 411, 421 (7th Cir. 2012). But in those cases, as well as others using similar language, the evidence presented in the habeas proceedings related to the ineffective assistance claim. With respect to Petitioner's new evidence (Coley's affidavit, Sanford's affidavit, and Faulkner's texts), only Sanford's affidavit relates to his ineffective assistance claim. This Court therefore considers only whether the jury "would have had a reasonable doubt respecting guilt" had Sanford's testimony been presented at trial. *Strickland*, 466 U.S. at 695.

On the night of September 21, 2008, he was at an apartment at 716 St. Louis;

While moving a fan from a window, he "witnessed the shooting";

Sanford "saw three men wearing hoodies approach the young men 'shooting dice' ";

Sanford "saw these men begin shooting at the young men";

"One of the bullets struck [Sanford], causing a minor wound'";

Sanford knew "Noman Johnson for many years before the shooting, and . . . would have recognized Norman Johnson by sight";

None "of the shooters resemble[d] Norman Johnson";

"Although [Sanford] was unable to see [the shooters'] faces due to darkness and their lowered hoodies, all were taller than Norman Johnson";

"All of the shooters appeared to be around five feet, eleven inches";

Sanford "know[s] Norman Johnson to be approximately five feet, six inches";

Sanford viewed a photo array, but "did not identify Mr. Johnson as one of the gunmen."

(Dkt. 9-1.)

Sanford's testimony, as defense counsel's opening statement noted, would have reinforced the inconsistencies in the eyewitnesses' descriptions of the shooters, such as whether there were two versus three shooters; whether they all wore hoodies, or one wore a white t-shirt and baseball cap; and whether they were all tall, or were varied in height. Also, Sanford would have been the only eyewitness to the shooting testifying that Petitioner was not one of the shooters.

13

But the Court must weigh Sanford's purported testimony against "the totality of the evidence before the . . . jury." *Strickland*, 466 U.S. at 695. That evidence included: Fresh's identification of Petitioner as a shooter in photo arrays and before the grand jury; an officer's and assistant state's attorney's testimony about Fresh's certainty when making those identifications; Faulkner's identification of Petitioner as a shooter; Coley's trial testimony stating that he was the main shooter and that Petitioner was with him; Defense Investigator Taylor's notes, which provided Faulkner's description of the two shooters she saw—"one shooter, ID, light skinned . . . Jason, big eyes, average height . . . other shooter [Faulkner] saw before with Jason but doesn't know his name, short and dark" *(*Dkt. 36 at 422–23, 856–57); contradictory alibi testimony from English Wilson and Deonte Sanders (*id.* at 883–85, 909–11); and damaging testimony from Defense Investigator Taylor saying that, during the defense team's interview of Coley in a courtroom a few weeks before trial, he admitted, contrary to what he told police officers, that he knew all the men with him during the shooting, and "called out Norman Johnson" as one those men. (*Id.* at 865.)

However, neither identification by Faulkner nor Fresh was ironclad. At trial, Faulkner was never asked directly whether Petitioner was the second shooter. Instead, her identification of Petitioner was based on her testimony that she picked him out of a lineup. (Dkt. 36 at 398–99.) On cross-examination, Petitioner's counsel highlighted that Faulkner's lineup identification may have been tainted by two officers visiting Faulkner in a room at the police station before the lineup, showing

her Petitioner's picture, and telling her that Petitioner was always with Coley and that the second shooter was probably Petitioner. (*Id.* at 422–24, 859.) Coley similarly testified that the officers who interrogated him "showed [him Petitioner's] picture and [said] his name before [Coley] even said anything." (*Id.* at 504.) As to Fresh's identification, he testified at trial that he saw none of the shooters' faces, that he recognized Jason Coley only from his voice, and that, once the shooting began, Fresh closed his eyes and ran. (*Id.* at 448–49.) Whether Fresh saw Petitioner or assumed he was with Coley because Fresh usually saw them together is unclear.

But it *was* clear from the trial evidence that both Faulkner and Fresh knew Coley and Petitioner from the neighborhood. Faulkner testified that she told Defense Investigator Taylor that the second shooter was "short and dark" and someone whom Faulkner "saw before with Jason [Coley]." (*Id.* at 422–23, 426, 856–57.) Although a police report from the night of the shooting did not reflect that Faulkner told the investigating officer "that [she] knew either of those people from the neighborhood," she stated at trial that "[she] did tell him that." (*Id.* at 426.) Although Fresh did not identify Petitioner at trial, he knew Coley and Petitioner before the shooting, he identified them both in photo arrays, and he identified them at the grand jury as being present during the shooting. (*Id.* at 460–62, 467–69, 476, 572–81, 790–93.)

Coley's testimony followed Faulkner's and Fresh's identifications. Coley confessed to the shooting and stated Petitioner was with him. (*Id.* at 496–98, 504–05.) Jurors also saw Coley's videotaped confession, during which Coley stated Petitioner was with him. Later in the trial, jurors heard testimony from Defense

Investigator Taylor that Coley, after admitting to the defense team that he lied to officers about not knowing all the men with him, still stated—as he always did—that Petitioner was with him during the shooting. (*Id.* at 865.)

Adding Sanford's testimony to this body of evidence would not have created a reasonable probability of acquittal. Sanford acknowledges that he saw none of the shooters' faces. (Dkt. 9-1.) Sanford estimated that the shooters were all five feet eleven inches tall, so he excluded Petitioner, who is five foot six inches. But Sanford's estimation is oddly precise given that (1) Sanford viewed the shooting at night from an elevated perch (his second-story window), and (2) all three shooters, according to Sanford, were wearing hoodies, which could have obscured their true heights.[6] (*Id.*) Sanford's would-be testimony must be weighed against the testimony of three eyewitnesses, all of whom knew Petitioner or had previously seen him in the neighborhood and testified that Petitioner was with Coley during the shooting.

Considering the totality of the evidence against Petitioner, Sanford's testimony does not demonstrate a reasonable probability that the result of the trial would have been different. The evidence against Petitioner, unlike most of the cases in which

---

[6] This Court's *Strickland* prejudice analysis, as the discussion above suggests, relies mainly on the strength of the trial evidence against Petitioner, not the weakness of Sanford's purported testimony. As the Seventh Circuit has explained, a federal habeas court should not "assum[e] that the language [in witnesses'] affidavits would have been the totality of the witnesses' testimony had they been called at trial." *Lee v. Kink*, 922 F.3d 772, 775 (7th Cir. 2019). But even assuming Sanford would have said more on the witness stand than what was in his affidavit, he would not be able to contradict or stray too far from the statements in his affidavit: namely, that he saw none of the shooters' faces, and that his main reason for excluding Petitioner was Petitioner's shortness compared to the heights of the shooters. (Dkt. 9-1.) In contrast to the significant trial evidence against Petitioner, Sanford's putative testimony is weak.

courts found prejudice under *Strickland*, was not weak. *See*, *e.g.*, *Jones*, 842 F.3d at 465 (weighing a codefendant's confession that he was the only shooter "[a]gainst . . . very weak prosecution witnesses"); *Woods v. Schwartz*, 589 F.3d 368, 378 (7th Cir. 2009) (while addressing *Strickland*'s prejudice element, noting that "at trial, two eyewitnesses is very strong evidence of guilt"). Petitioner cannot establish prejudice from his counsel's failure to elicit Sanford's testimony at trial.

### B.   Petitioner Cannot Show Deficient Performance

Although Petitioner's failure to show prejudice is sufficient to deny relief, *Westray*, 36 F.4th at 749, the Court also notes that Petitioner cannot demonstrate deficient performance. To prove deficient performance, Petitioner must show that his attorney's "representation fell below an objective standard of reasonableness." *Harrington*, 562 U.S. at 104. The Court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689). In other words, "the defendant must overcome the presumption that . . . the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. Such a presumption exists "to eliminate the distorting effects of hindsight" in order to consider the challenged "conduct from counsel's perspective at the time" of trial. *Id.* The attorney's "decision must be—in fact—strategic" for this presumption to apply, *Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020), and a court adjudicating a *Strickland*-based claim "can't just label a decision 'strategic' and thereby immunize it from constitutional scrutiny," *id.* at 593 (quoting *Jones v. Calloway*, 842 F.3d 454, 464 (7th Cir. 2016)).

Deficient performance can be found if a defense attorney relied so heavily on an "improbable assumption" about what would occur at trial that, when the strategy "blew up, counsel had no Plan B." *Id.* at 593.

As the Court stated in its May 20, 2021 order, there may be questions as to why Sanford was not called to testify. (Dkt. 47 at 8.) And that earlier order may have implied that the Court had reason to question counsel's performance. (Dkt. 47 at 7–8.) But upon further reflection, and after considering the appropriate deference that must be afforded to trial counsel's strategic decisions, the Court finds that trial counsel's performance was not deficient under *Strickland*.

In its earlier order, the Court explained the viable strategic purpose for declining to call Sanford. In her closing argument, Petitioner's counsel stated that Sanford's "residence . . . [had a] perfect shot for looking out the window and seeing who did this . . . [,] and yet the State did not call him." (*Id.* (quoting Dkt. 36 at 706)) These comments suggest "that counsel was aware of the likely content of Sanford's testimony yet chose intentionally not to call Sanford precisely to set up the argument that there was unaired evidence damaging to the prosecution's case." (*Id.*) Moreover, Petitioner's own affidavit included with his state postconviction petition states that, when he asked his attorney why she did not call Sanford to testify, she "said it was trial strategy" and that "for two years . . . she gave it some thought and she wanted the State to do it." (Dkt. 36 at 38, 52.) This shows that trial counsel grappled with the pros and cons of calling Sanford but ultimately decided that Petitioner's defense was best served by arguing that the prosecution's omission of Sanford's eyewitness

testimony was suspect. This strategic decision is entitled to substantial deference. *See Strickland*, 466 U.S. at 691. Because counsel "gave . . . some thought" to calling Sanford but reasonably decided it was better to have the prosecution call him as a witness, *see Harris v. Cotton*, 365 F.3d 552, 555 (7th Cir. 2004) ("[C]hoices made by an attorney as to what evidence should be presented . . . are strongly presumed to be tactical decisions and therefore, objectively reasonable."), Petitioner's trial counsel did not provide Constitutionally-deficient performance. This holding provides an additional, independent basis for declining to issue a writ of habeas corpus. *Westray*, 36 F.4th at 749, 753 (denying writ of habeas corpus because petitioner failed to make requisite showing on one *Strickland* prong).

## C. Petitioner Cannot Satisfy AEDPA's Requirements for Introducing New Evidence of Deficient Performance

Petitioner argues that the Court should consider new evidence before deciding whether Petitioner's counsel performed deficiently. In its May 20, 2021 order, the Court asked the parties to "elaborate on the investigation by defense counsel (if any) into Sanford as a potential trial witness, as well as the strategic choices (if any) that underlay the decision not [to] call Sanford at trial." (Dkt. 47 at 8.) Petitioner then filed a motion to conduct discovery regarding the decision not to call Sanford to testify, requesting depositions of his former attorneys, their investigator, and possibly others, and the production of the attorneys' case file. (Dkt. 50.) Petitioner also submitted affidavits from Sanford and an affidavit from Defense Investigator Taylor, both of which were obtained after Petitioner filed his Section 2254 petition. (Dkt. 9-1; Dkt. 58-1; Dkt. 58-2.) By requesting elaboration about the *existing* record evidence

19

regarding deficient performance, the Court likely (and inadvertently) prompted Petitioner both to submit, and to request permission to obtain, *new* evidence on this issue. Additional discovery, however, is not permitted in this case under the standards of AEDPA.

If the petitioner "has failed to develop the factual basis of a claim in State court proceedings, the court shall not" consider new evidence "on the claim unless the [petitioner]," among other requirements, demonstrates that the new evidence will establish his innocence "by clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(2).[7] A petitioner "fail[s] to develop the factual basis of a claim if there "is lack of diligence, or some greater fault, attributable to the prisoner." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1735 (2022) (cleaned up). Diligence for purposes of Section 2254(e)(2) depends on "whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams v. Taylor*, 529 U.S. 420, 435 (2000); *see also Williams v. Jackson*, 964 F.3d 621, 631 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1237 (2021).

---

[7] Although Section 2254(e)(2) expressly refers only to an "evidentiary hearing," the Supreme Court has clarified that the section's requirements apply whenever a federal habeas court "admits or reviews new evidence." *Shinn*, 142 S. Ct. at 1738 (citing *Holland v. Jackson*, 542 U.S. 649, 653 (2004) (Section 2254(e)(2)'s "restrictions apply a fortiori when a prisoner seeks relief based on new evidence without an evidentiary hearing.")). "A contrary reading would have countenanced an end-run around the statute. Federal habeas courts could have accepted any new evidence so long as they avoided labeling their intake of the evidence as a 'hearing.' " *Shinn*, 142 S. Ct. at 1738; *see also Boyko v. Parke*, 259 F.3d 781, 790 (7th Cir. 2001) (A federal habeas "petitioner must satisfy § 2254(e)(2)'s requirements before he may place new factual information before the federal court."); *Cargle v. Mullin*, 317 F.3d 1196, 1209 (10th Cir. 2003) (same) (citing *Dorsey v. Chapman*, 262 F.3d 1181, 1190 (11th Cir. 2001)).

To prove ineffective assistance, Petitioner had to show deficient performance and prejudice. Petitioner, however, failed to develop facts in state court regarding deficient performance. Petitioner attempted to do so just once when he questioned his attorney "why she did not call" Sanford, to which she responded that "for two years . . . she gave it some thought and she wanted the State to do it." (Dkt. 36 at 52; *see also* Dkt. 36 at 38.) Petitioner's current counsel points to a letter from his trial counsel responding to Petitioner's request, while he was preparing his state postconviction petition, for copies of Sanford's and Faulkner's statements. (Dkt. 50-1 at 9; Dkt. 55 at 8–9; Dkt. 56 at 2.) In the letter, trial counsel instructed Petitioner, "Let me know what you're trying to establish." (*Id.*) But nothing in Petitioner's Section 2254 filings, nor anything in the state record, shows that Petitioner took his trial counsel up on her offer for further clarification as to her reasons for not calling Sanford. (*See* Dkt. 50-1; Dkt. 55; Dkt. 56.) Petitioner thus did not diligently develop the factual basis for deficient performance.

Accordingly, Petitioner must satisfy Section 2254(e)(2)(B), which requires that "the facts underlying the claim" for which he seeks discovery "would be sufficient to establish [his innocence] by clear and convincing evidence." 28 U.S.C. § 2254(e)(2)(B). In other words, Petitioner must demonstrate that, if granted additional discovery on deficient performance, no reasonable jury would have found him guilty. As previously explained, Petitioner cannot establish prejudice from omission of Sanford's testimony at trial. So, even if Petitioner's additional discovery could prove deficient performance, this new evidence would not alter the Court's conclusion that Petitioner

was not prejudiced. *See Segarra v. Thurmer*, 2010 WL 5104981, *9–10 (E.D. Wis. Dec. 8, 2010) (denying petitioner's motion for an evidentiary hearing because the new evidence "fails to allege facts that, if true, would entitle him to habeas relief"). For these reasons, the Court denies Petitioner's discovery motion.

### D. Notice of Appeal and Certificate of Appealability

Petitioner is advised that this is a final decision ending his case in this Court. If he wants to appeal, Petitioner must file a notice of appeal in this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). In any event, because Petitioner cannot (in the Court's view) make a substantial showing of the denial of a constitutional right or error with this Court's procedural ruling, *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2)), the Court declines to issue a certificate of appealability.

## III. CONCLUSION

Petitioner's habeas corpus petition (Dkt. 1) is denied on the merits. Petitioner's request to conduct discovery (Dkt. 50), as well as any other pending motions, are denied. The Court declines to issue a certificate of appealability. A final judgment order will be entered separately. The Clerk of Court is directed to: (1) substitute Charles Truitt, Warden of Stateville Correctional Center, as Respondent in place of David Gomez; and (2) alter the caption of this case to *Johnson v. Truitt*.

SO ORDERED in No. 17-cv-03997.

Date: September 28, 2022

_____
JOHN F. KNESS
United States District Judge